**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250490-U

Order filed July 23, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| MARY C. GRAVES, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Petitioner-Appellee, | ) | Will County, Illinois, |
| | ) | |
| | ) | Appeal No. 3-25-0490 |
| v. | ) | Circuit No. 24-OP-1870 |
| | ) | |
| BRIAN K. GRAVES, | ) | Honorable |
| | ) | David Garcia, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Bertani concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   The trial court abused its discretion in granting petitioner's motion for a directed finding at the close of petitioner's case and issuing a plenary order of protection.

¶ 2      Respondent, Brian K. Graves, appeals the trial court's order granting petitioner's, Mary C. Graves's, petition for an order of protection and issuing a plenary order of protection against him. For the following reasons, we vacate the trial court's order and remand for further proceedings.

¶ 3                          I. BACKGROUND

¶ 4        This case has an extensive procedural history. We recount only those facts necessary to explain our decision.

¶ 5        Mary is Brian's elderly mother. On July 12, 2024, Mary filed a petition for an order of protection against Brian, averring that an order of protection was necessary because "of financial exploitation of my account in the amount of $25,000." Mary further averred that Brian "switched over some financial records to his email" and "is walking around with a POA [power of attorney] that I null and voided and he tried to go to Charles Schwab and access my account again." She requested that Brian be ordered not to threaten or commit harassment, stalking and neglect of a high-risk adult with disabilities. She also requested that Brian have no contact with her or her residence. On that same date, an emergency order of protection was issued granting the above-requested remedies, which was served on Brian a few days later. The trial court entered a succession of interim orders of protection on several dates leading up to entry of the plenary order of protection that is the subject of this appeal.

¶ 6        On one of the successive interim order of protection dates—April 15, 2025—the trial court found that "a guardianship proceeding with respect to Mary Graves may best serve the interests of justice and the various interested parties[.]" Subsequently, Brian filed a petition for guardianship on April 21, 2025, and his sister, Tracy Kieklak, filed a competing petition for temporary guardianship on June 13, 2025. Tracy was appointed Mary's temporary guardian with letters of office issuing that same date. On June 17, 2025, the guardianship proceeding was consolidated with the order of protection hearing over Brian's objection.

¶ 7        The plenary order of protection hearing took place on September 19, 2025; Mary was represented by counsel, and Brian represented himself. Prior to the presentation of evidence, the trial court discussed some procedural issues with the parties. This discussion included the court

2

clarifying to Brian that he could cross-examine Mary's witnesses after their testimony and recall them in his case.

¶ 8   Mary called Brian as her first witness. Questioning centered around the circumstances of the $25,000 transfer from Mary to Brian, whether it was in fact a loan, and attempts to change e-mail authorizations for Mary's financial account. After Mary's direct examination of Brian, the trial court informed Brian, "[Y]ou could testify to anything that [Mary] questioned you on * * * You can't show me any evidence." Brian sought clarification, "I can't show you any evidence. I have to leave that for later?" The trial court responded in the affirmative.

¶ 9   Mary called her daughter Tracy as the second witness. Tracy's testimony included historical information regarding family finances as well as Mary's lack of proficiency with computers and texting. Various powers of attorney purportedly executed by Mary and issues with Mary's Charles Schwab account were also discussed. Tracy ultimately opined that Mary never intended to loan Brian $25,000. At the conclusion of her testimony, the trial court stated, "You can come back in your case in chief. But you can't cross-examine her on testimony she did here."

¶ 10   Mary next called Lisa Kinser, the guardian *ad litem*, who testified about conversations with Mary and then opined as to Mary's mental capacity and whether Mary intended to make the loan in question. Before beginning his cross-examination, Brian again asked the trial court, "To clarify, I can ask her questions about what we just covered, and then I can recall her later if I talk about stuff that is not covered; is that correct judge?" The court responded in the affirmative. At the conclusion of his cross-examination, Brian "reserve[d] the right to call this witness later on different items as you say[,]" at which point the trial court stated, "[Y]ou could call her in your case in chief." Mary then asked the guardian *ad litem* questions in rebuttal, after which the court

3

again answered, "All right," when Brian indicated that he would recall the guardian *ad litem* in his case.

¶ 11     Mary next called Bailey Bryant, a Will County senior services employee. In summary, Bryant testified as to her impression of Mary's mental faculties as well as to whether Mary intended to loan Brian $25,000. Due to Bryant's unavailability to be recalled later by Brian, the trial court gave Brian latitude to question Bryant beyond the scope of her direct examination.

¶ 12     Mary's final witness was Timothy Craven, her neighbor of some 20 years. Craven's testimony primarily concerned observations he made of Brian's visits with Mary on the June 17, 2024, and June 24, 2024, dates surrounding the purported loan at issue. When Mary objected to Brian's cross-examination as beyond the scope of her direct examination, the trial court sustained the objection. Brian stated, "All right * * * But I reserve for my chief." The court responded, "Okay."

¶ 13     Immediately after, Mary indicated that she was resting and orally moved for a directed finding as follows:

> "And I am going to make a motion for a directed finding. I believe that the Court has heard enough witnesses, including the GAL, APS, Tracy Kieklak to identify that this amount of money was never contemplated by Mary Graves to be given to her son.
>
> The testimony by Brian Graves is problematic because [] suddenly his mom suggests giving him money. But then it becomes a loan. If it was supposed to be a gift, then it would be a gift. But we now have a loan document.
>
> So we have no, anything saying that any of this was legitimate. * * *"

4

¶ 14    Mary further argued, "So I believe we presented enough evidence that the order of protection should be granted and all of this argument is going with my citation that was issued against him that the money should be returned to this ward."

¶ 15    Brian responded, "Judge, I am going to call witnesses." The court replied, "What is your response to her motion for a directed finding?" Brian stated, "I disagree with it[,]" and then spoke at length about what he characterized as speculation, "a story being put around here," and attempted to explain the nature of the loan from his mother. He further disputed the timing of his mother's memory issues. Ultimately, he characterized the matter as a "family dispute" and indicated that "[m]y sisters have moved over half a million dollars in assets and removed both my brother and I as beneficiaries of my mom's estate so that those assets go to them."

¶ 16    At this point, counsel for Mary objected, stating, "None of that has been produced." The trial court apparently sustained the objection, indicating, "He can babble on on things that have not gone into evidence. I am not taking any of it into consideration."

¶ 17    Brian protested, "Judge, I have not had a chance to present my case, my witnesses, my evidence. I am assuming I will have a chance to do that." The court ignored Brian's protestation and asked if Brian was done responding to the motion for a directed finding. Brian answered, "I can't talk about any of that stuff. I haven't had a chance to present it." Mary again argued in support of her motion for a directed finding. The trial court turned to Brian and asked him if he had a witness from the bank. Brian indicated that he had notarized documents he intended to introduce, and the court asked if he had a witness from the bank to validate the notarized documents. Brian reminded the court that he "ha[d] not had a chance, Judge, to present my evidence and my witnesses."

¶ 18    The following colloquy ensued:

"THE COURT: The problem I have here is that you talk out of both sides of your mouth. You are questioning the lady from protective services, and you are arguing that [your mother] has memory problems when she talked to them 15 days after. And at the same time, you argue that your mother at the time of the loan was of sound mind. How can you do both? How can you argue both things?

[BRIAN]: Can I speak?"

THE COURT: Yes, I am asking you.

[BRIAN]: Yes, Judge, I am finding the document.

THE COURT: I don't want to hear about any documents. I want you to tell me how you can argue out of both sides of your mouth that she has memory issues and at the same time say that she was of sound mind when she signed that document.

[BRIAN]: She was of sound mind when she signed the document, Judge. My—15 days later, I don't know what happened to my mom. * * *

THE COURT: You know what,* * * I am going to grant the motion, I am going to extend the order of protection for two years.

I am going to tell you something. I don't give a crap about what you want. I don't give a crap about what your sister wants. You hear me? I don't care. I am going to protect your mother from all of you. Because you are already picking the bones of your mother. She is not dead yet.

[BRIAN]: Judge—

THE COURT: That is the order of the Court. I don't want to hear it. That is the order of the Court."

¶ 19     Mary then moved to have the evidence considered as it related to a citation and asked, "Is there a citation, or should we come back for a hearing on citation on the recovery of the $25,000?" The Court responded, "No, you got the citation."

¶ 20     Brian interjected, "Judge, I didn't get to present my evidence." The court responded, "That is because they did a motion for a directed finding after their case. And you didn't give a valid argument on why I shouldn't grant it. You just babbled on about this and that and didn't argue about it." Brian protested, "I had a whole argument here, Judge. I thought I was going to have an opportunity to present it." The trial court merely responded, "Order to come" and further stated, "You know what, there is an appellate court."

¶ 21     As to the "citation," the trial court ordered Brian to turn over $25,000 within 30 days. When Brian asked, "Judge, it's a two-year loan. It's due in June of next year. Can't we just make it on the due date?" The court said, "No." While the instant record does not contain the motion for a "citation," we observe that the plenary order of protection addressed payment of losses because of abuse and, due to "fraudulent transfer-exploitation," ordered the total amount of $25,000 to be paid to Mary by October 10, 2025. See 750 ILCS 60/214(b)(13) (2024)).

¶ 22     Brian timely filed a notice of appeal.

¶ 23                              II. ANALYSIS

¶ 24     On appeal, Brian argues that he was deprived of his procedural due process rights where the trial court provided him no opportunity to present his case, instead granting Mary's motion for a directed finding at the close of her case in chief. An individual's right to procedural due process is guaranteed by the United States and Illinois Constitutions. See U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2. Mary counters by asserting that the trial court's grant of her motion for a directed finding was procedurally proper in accordance with section 2-1110 of the Illinois Code

7

of Civil Procedure (Code) (735 ILCS 5/2-1110 (West 2024), entitled "Motion in non-jury case to find for defendant at close of plaintiff's evidence"). For the reasons set forth below, we vacate the order of protection entered against Brian and remand for further proceedings as directed.

¶ 25    All proceedings to obtain an Illinois order of protection are governed by Illinois rules of civil procedure. 750 ILCS 60/205(a) (West 2024). Mary relies upon section 2-1110 of the Code to uphold entry of the order of protection against Brian. Section 2-1110 provides in relevant part, "In all cases tried without a jury, *defendant may*, at the close of plaintiff's case, move for a finding or judgment in his or her favor." (Emphasis added.) 735 ILCS 5/2-1110 (West 2024). In so relying, Mary asks us to conduct the two-prong analysis set forth in *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275-76 (2003). First, the court determines as a matter of law whether the plaintiff has presented a *prima facie* case "by proffering at least some evidence on every element essential to [the plaintiff's underlying] cause of action." (Internal quotation marks omitted.) *Id.* at 275. If the plaintiff establishes a *prima facie* case, then the court proceeds to the second prong, where it sits as the finder of fact and considers the totality of the evidence presented. *Id.* at 275-76. After weighing the evidence, the court determines "whether sufficient evidence remains to establish the plaintiff's *prima facie* case." *Id.* If the court finds in the plaintiff's favor, the trial continues. *Id.* If, however, the court finds in the defendant's favor, "a judgment dismissing the action shall be entered." 735 ILCS 5/2-1110 (West 2024).

¶ 26    Ordinarily, a section 2-1110 ruling will not be reversed unless it is against the manifest weight of the evidence. *Cryns*, 203 Ill. 2d at 276. Here, however, the trial court's decision to grant Mary's motion for a directed finding does not warrant deference. Simply put, section 2-1110 is unavailable to plaintiffs and does not authorize a plaintiff to move for directed verdict at the close of its case-in-chief. By its own terms, section 2-1110 applies solely to defendants and authorizes

8

defendants to move for directed finding at the close of the plaintiff's case-in-chief. Though Mary persists in arguing that section 2-1110 also allows plaintiffs to move for directed finding at the close of their case-in-chief, she provides neither statutory nor case law authority for this proposition. Nor could she, for such a procedure would be at odds with basic notions of fairness and procedural due process.

¶ 27        Turning to the merits, we must determine whether Brian was deprived of his procedural due process rights when he received no opportunity to present his case at the close of plaintiff's case-in-chief. "Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property." *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201 (2009). Due process is a flexible concept, which " 'calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To determine whether the procedure employed comports with due process, a court must consider and balance (1) the private interests affected by the official action, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value, if any, of additional or substitute safeguards, and (3) the governmental interest. *Id.* at 335. We review *de novo* whether a party was denied procedural due process. *People v. Sauls*, 2022 IL 127732, ¶ 32.

¶ 28        First, we note that the conditions imposed by the order of protection here implicate Brian's interests in his freedom of movement and association as well as his property. Pursuant to the order of protection, Brian is prohibited from having any contact with Mary or her residence for two years and he is required to return the $25,000 he contends was a loan from Mary. See *People v. Deleon*, 2020 IL 124744, ¶ 32 ("important factor in assessing the impact of official action on

9

private interests is the possible length of wrongful deprivation of *** benefits.") (Internal quotation marks omitted.) Thus, the first factor clearly weighs in Brian's favor.

¶ 29   Next, we consider the risk of an erroneous deprivation of the above interests given the procedures used and the value of any additional safeguards Brian requests. *Mathews*, 424 U.S. at 335. The only additional procedural safeguard Brian requests is the ability to present his witnesses and exhibits. Notwithstanding the trial court's repeated assurances that Brian would have the opportunity to testify further on his own behalf, recall witnesses, and present evidence in his own case, the trial court inexplicably precluded Brian's attempts to do so after Mary rested and moved for a directed finding. The trial court essentially made credibility determinations and findings of fact without hearing the entirety of the case and despite Brian's expressed intent to testify further on his own behalf, conduct more expansive direct examination of witnesses previously called by Mary, and offer documentary evidence. The court's decision to deprive Brian of the opportunity to present this evidence clearly risked the deprivation of his interests in this case.

¶ 30   The third factor under the procedural due process framework set forth in *Matthews* does not apply here. *Mathews,* 424 U.S. at 335 ("the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail*"). There are no pending governmental matters as contemplated in *Matthews.* But see *Deleon*, 2020 IL 124744, ¶¶ 29-31 (recognizing governmental interest in companion order of protection case where victim of pending criminal case was the petitioner). Any interest the government may have in protecting victims of financial exploitation of an elderly person is not dispositive here because Mary, and not the State, initiated the proceeding.

¶ 31   Procedural due process entitles an individual to "the opportunity to be heard at a meaningful time and in a meaningful manner." *In re D.W.*, 214 Ill. 2d 289, 316 (2005). We

acknowledge that due process is a flexible concept and not all circumstances call for the same type of procedure. *Konetski*, 233 Ill. 2d at 201. That having been said, the circumstances of this case required that Brian be afforded the opportunity to present his evidence before issuance of a two-year plenary order of protection with remedies affecting Brian's freedom of movement, association rights, and property. Simply put, "[b]asic notions of fair play require that the parties have the opportunity to *** refute facts which form the basis of the court's decision." *In re Marriage of Doe*, 2024 IL App (1st) 230935, ¶ 61. We thus vacate the trial court's judgment and remand for further proceedings where Brian shall be afforded a full opportunity to present his evidence before the court renders its decision.

¶ 32     As a final matter, we admonish Brian for citing non-existent case law in his brief but decline Mary's request to dismiss the appeal as a sanction. In doing so, we note the lack of any case law addressing the anomalous procedure employed here, including the case law upon which Mary relies. There is simply no authority to support the trial court's outright disregard of Brian's procedural due process rights.

¶ 33                                    III. CONCLUSION

¶ 34     The judgment of the circuit court of Will County is vacated, and this case is remanded for further proceedings consistent with this disposition.

¶ 35     Vacated and remanded.

11